IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

CELLCO PARTNERSHIP d/b/a :
VERIZON WIRELESS, :
 :
  Plaintiff, :
 :
v. : CASE NO.: 7:20-CV-00050 (WLS)
 :
CITY OF VALDOSTA, GEORGIA, :
*et al.*, :
 :
  Defendants. :

## ORDER

Before the Court are cross motions for summary judgment, filed on April 23, 2021 by Plaintiff Cellco Partnership d/b/a Verizon Wireless ("Plaintiff" or "Verizon") and Defendant City of Valdosta, Georgia ("Defendant" or the "City"). (Docs. 28 & 31.) Both motions for summary judgment are ripe for review. *See* M.D. Ga. L.R. 7.3.1(a).

## I.   PROCEDURAL HISTORY

Verizon filed this action on March 25, 2020 against the City of Valdosta, Georgia, the City Council for Valdosta, and Valdosta's City Council members for the denial of Plaintiff's "application to construct a wireless telecommunications facility on real property located in the City of Valdosta, Georgia." (Doc. 1 ¶ 1.) Plaintiff alleges that "[t]he City's denial of Verizon Wireless' application violates the Communications Act of 1934, as amended by the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7), (the "TCA"), and [that] Verizon Wireless is entitled to an order directing the City to grant Verizon Wireless' application for the proposed facility." *Id.* ¶ 6. Plaintiff brought three counts: (1) Failure to Comply with the Supported by Substantial Evidence Requirement as required by 47 U.S.C. § 332(c)(7)(B)(iii); (2) Unreasonable Discrimination Among Providers of Functionally Equivalent Services; and (3) Unlawful Prohibition of the Provision of Personal Wireless Services. (Doc. 1.)

After the initial Scheduling and Discovery Order was entered (Doc. 13), this case was reassigned from Judge Leslie Abrams Gardner to the undersigned on August 10, 2020. (*See*

docket.) Thereafter, this Court granted a joint motion to extend discovery and issued an order applying its usual discovery rules to this case. (Doc. 15.) After an additional extension of the discovery period, discovery finally closed on April 5, 2021, and dispositive motions were due on April 23, 2021. (Doc. 19.) The Court also granted Plaintiff's unopposed motion for a protective order (Doc. 22) and Plaintiff's unopposed motion to dismiss Count Two of its Complaint (Doc. 24). Thus, only Counts One and Three remain. Additionally, the Court granted an unopposed motion to dismiss the individual City Council members as Defendants. (Doc. 49.)

Plaintiff timely filed a motion for summary judgment, which has been fully briefed. (Docs. 28, 41, 42.) The City also timely filed a motion for summary judgment, which has been fully briefed. ((Docs. 31, 43, 44, 47.)[1] Because the Parties had not clarified how the Court should resolve disputes of fact, the Court ordered that both Parties file a supplemental brief "explaining their position on whether the Court is proceeding essentially on administrative review and can resolve all disputes of fact in its order resolving the motions for summary judgment or whether, if a genuine issue of material fact exists, the Court should set a hearing, bench trial, or jury trial for the resolution of material factual disputes." (Doc. 50.) Both Parties timely responded and agree that as to Count One, the Court should resolve the dispositive motions based on the record as presented to the City Council and that no further facts or evidence should be provided. (Doc. 51 at 4; Doc. 52 at 2.) But as to Count Three, because evidence outside of the administrative record may be considered, the Parties assert that the Court can set an evidentiary hearing or bench trial to resolve factual disputes. (Doc. 51 at 5; Doc. 52 at 3.)

## II.    SUMMARY JUDGMENT STANDARD

### A.    Federal Rule of Civil Procedure 56

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Chow v. Chak Yam Chau*, 555 F. App'x 842, 846 (11th Cir. 2014) (citing *Maddox*

---

[1] Both Parties were granted an enlargement of the page limitations for their dispositive motion briefs. (Doc. 26.)

*v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013)). " 'A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.' " *Grimes v. Miami Dade Cnty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the non-moving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by citing to the record, that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Barreto v. Davie Marketplace, LLC*, 331 F. App'x 672, 673 (11th Cir. 2009). The movant can meet that burden by presenting evidence showing there is no dispute of material fact, or by demonstrating that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To avoid summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts.' " *Matsushita*, 475 U.S. at 586 (citations omitted). Instead, the non-movant must point to record evidence that would be admissible at trial. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form."). Such evidence may include affidavits or declarations that are based on personal knowledge of the affiant or declarant. *See* Fed. R. Civ. P. 56(c)(4).

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Matsushita*, 475 U.S. at 587-88; *Allen*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no

genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

### A.    Local Rule 56

Local Rule 56 requires the following:

> The movant for summary judgment under Rule 56 of the Federal Rules of Civil Procedure shall attach to the motion a separate and concise statement of the material facts to which the movant contends there is no genuine dispute to be tried. Each material fact shall be numbered separately and shall be supported by specific citation to particular parts of materials in the record. Material facts not supported by specific citation to particular parts of materials in the record and statements in the form of issues or legal conclusions (rather than material facts) will not be considered by the court. Affidavits and the introductory portions of briefs do not constitute a statement of material facts.

> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted, unless otherwise inappropriate.

M.D. Ga. L.R. 56.

Here, Defendant properly filed a summary judgment motion with a Statement of Undisputed Material Facts, as required by the Local Rules of this Court. (*See* Docs. 31 & 31-2.) Plaintiff did not attach to its motion a statement of undisputed material facts, although such a section was included in its brief, but Plaintiff did file a statement of facts upon filing its response brief. (Doc. 40.) Additionally, Plaintiff filed a response to Defendant's statement of material facts (Doc. 38), and Defendant filed a response to Plaintiff's purported statement of facts as included in Plaintiff's brief and to Plaintiff's separate statement of facts. (Docs. 41-1 & 44.)

Thus, Defendant complied with the local rule's requirement on statements of fact. Furthermore, as Plaintiff cured its error in failing to initially file a separate and numbered statement of material facts by separately filing a numbered statement of material facts, the

Court finds that Plaintiff has also complied with Local Rule 56.[2] Having established the applicable standards, the Court will proceed to the facts.

### III.    RELEVANT FACTUAL BACKGROUND

The following facts are derived from the Complaint (Doc. 1); Defendants' Answer thereto (Doc. 5); Defendant's Statement of Undisputed Material Facts and Plaintiff's response thereto (Docs. 31-2 & 38); Plaintiff's Statement of Undisputed Material Facts and Defendant's response thereto (Docs. 40 & 44); and the record in this case. Where relevant, the factual summary also contains undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits, all of which are construed in a light most favorable to the nonmoving party. *See* Fed. R. Civ. P. 56; *Matsushita*, 475 U.S. at 587-88.

"Verizon provides commercial mobile radio services, personal and advanced wireless communications services, and other telecommunications services." (Doc. 44 ¶ 1.) "Wireless data demand has increased exponentially over the last several years as a result of the massive increase in the use of wireless devices by consumers, businesses, schools, and governments." *Id.* ¶ 2. "To meet increased customer demand, Verizon, like other wireless carriers, has had to further develop its network to provide adequate signal strength and coverage." *Id.* ¶ 3.

Verizon "determined that it has a significant gap in its ability to provide reliable service in the heavily populated and trafficked north-western portion of the City." (Doc. 1 ¶ 30.) To fill the coverage gap, Verizon first looked into placing antennas on an existing tower, but the sole existing antenna within 3.8 miles of the area where Verizon determined it needs an additional telecommunications facility "cannot be used because it is located too close to existing Verizon Wireless antennas, would not offload traffic from certain of Verizon Wireless's existing sites, and would not fill the existing gap in coverage and capacity." *Id.* ¶ 36.

After identifying potential new sites for a facility, on October 9, 2018, Verizon had letters sent to owners of property in non-residential zones about the opportunity to have a wireless telecommunications facility placed on their property, but Verizon received no

---

[2] The Court notes that Plaintiff did not properly and fully comply with Local Rule 56 as Plaintiff's Statement of Material Facts cites only to Plaintiff's brief, rather than the record evidence. However, because the brief cites to record evidence, the Court will not disregard Plaintiff's statement of facts.

response to the letters. (Doc. 44 ¶¶ 40-41.) Thus, believing there were "no other options available," Verizon approached the Valdosta Country Club (the "Club"), and both parties eventually agreed to a 100'x100' section within the northern section of the Club's property (the "Club Site") for Verizon to place a wireless telecommunications facility. *Id.* ¶¶ 42-43. Verizon's facility would be placed within a 60'x60' area with opaque fencing and a planted vegetation buffer in a grove of pine trees as a 159-foot unlit "monopine tower to blend into its surroundings." *Id.* ¶¶ 44-46, 52. The entrance to the Club Site is at the end of Bellemeade Drive, which is a residential street with approximately 50 residential structures. (Doc. 38 ¶¶ 2-6.) The Club Site is in a residential area zoned R-15. (Doc. 1 ¶ 47.)

The City of Valdosta's Land Development Regulations ("LDR")[3] prescribe various rules for telecommunications facilities and their construction in Valdosta. (Doc. 29-1.) Because the LDR requires that Verizon obtain a Conditional Use Permit ("CUP") to construct its proposed facility, Verizon submitted an application for a CUP to the City containing supporting documentation on November 25, 2019 (the "Application"). (Doc. 1 ¶¶ 51, 54-57; Doc. 1-1; (Doc. 38 ¶ 28.) Verizon contends that its Application was "complete and included all required supporting documents in compliance with the Valdosta Telecommunications Ordinance" (Doc. 44 ¶ 48), but the City contends that Verizon's Application did not include various required information and documentation (Doc. 38 at 4-8; Doc. 44 at 24-25).

A report prepared on the Application by Valdosta's Planning and Zoning Administrator Matt Martin recommended approval of the Application to the City Council, subject to certain conditions. (Doc. 1-2 at 2.) The report also noted that the facility would be the first new wireless telecommunications facility in the City in more than ten years. *Id.*; Doc. 1 ¶ 60. Valdosta's Planning and Zoning Division prepared a review packet regarding the Application which was circulated to various departments within the City, but only one comment was received regarding the Application, and that was a comment from the landscape department "as a reminder to comply with the Ordinance." (Doc. 44 ¶¶ 50-51.)

The City's Planning Commission held a hearing on the Application on January 27, 2020, and opposition and support for the proposed facility was presented to the Planning

---

[3] The LDR is also known as the "Valdosta Telecommunications Ordinance." LDR § 218-20(A).

Commission. (Doc. 38 ¶¶ 49-50.) As stated in the LDR, Valdosta's overall "Comprehensive Plan" is:

> [T]o promote the health, safety, morals, convenience, order, prosperity and general welfare of the city; lessening congestion in the streets, securing safety from fire, panic and other dangers; providing adequate light and air; preventing the overcrowding of land; avoiding undue concentration of population; preventing urban sprawl, facilitating the adequate provision of transportation, sewerage, water, schools, parks and other public requirements; promoting desirable living conditions and the sustained stability of neighborhoods, protecting property against blight and depreciation, securing economy in governmental expenditures, conserving the value of buildings; and encouraging the most appropriate use of land and buildings throughout the City of Valdosta.

(Doc. 38 ¶ 76) (citing the LDR). Finding the Application inconsistent with the Comprehensive Plan, the Planning Commission voted to recommend denial of the Application by a 6-3-1 vote. *Id.* ¶ 51.

Thereafter, the City Council held a public hearing on February 10, 2020, prior to which the City received petitions both in support of and opposed to the development of the proposed facility on the Club Site. (Doc. 44 ¶¶ 66-67.) At the hearing, Verizon submitted evidence and documentation in support of its Application, including an appraiser's report and evidence that it had no alternative sites for a facility and that the facility was safe and complied with the LDR. (Doc. 44 at 27-30.) Testimony and documents were also presented in opposition to the Application, including "at least 17 letters/emails from residents in the area opposing the Tower; written testimony along with oral testimony showing the tower would create safety issues due to it only being accessed by a curvy and narrow road; evidence that Verizon did not seriously consider alternative non-residential sites; both written evidence and testimonial evidence of specific aesthetic concerns; evidence the tower would negatively affect the area's property values; evidence Verizon did not comply with the Valdosta's telecommunications ordinance; and evidence Verizon's CUP application was incomplete." *Id.* at 30 ¶ 76 (citations and footnotes omitted). Three residents spoke in opposition to the Application, and Councilman Tim Carroll spoke about his concern that there are no other cell towers in R-15 zoning districts and of depreciating property values. *Id.* at 31-33. "At the conclusion of his speech, he moved to deny the CUP Application and the City Council voted 7 to 0 to deny the CUP Application." *Id.* ¶ 84. A written letter of denial followed. *Id.* ¶ 85.

Thereafter, Verizon brought this action requesting "that this Court hold an expedited hearing, issue an injunction holding that Defendants violated the TCA, and enter an order granting the Application and all approvals necessary to allow construction of the proposed telecommunications tower on the Club Site." (Doc. 1 at 27.)

## IV.   **DISCUSSION**

Consistent with the two counts remaining in its Complaint, Verizon argues that the City's denial of the Application violated the Telecommunications Act of 1996 (the "TCA") because it was not supported by substantial evidence and effectively prohibited the provision of personal wireless services. (Doc. 29 at 4.) By contrast, the City contends that its denial of the Application was based on substantial evidence and that Verizon "failed to demonstrate it was entitled to a conditional use permit." (Doc. 31-1 at 14.) Further, the City argues that its decision "does not prohibit the provision of wireless services as Verizon has not made a prima facia case that there are no alternative locations or that the proposed site is the least intrusive." (Doc. 31-1 at 26.) The Court addresses these two issues in turn.

### A.   **Whether the City's Decision was Supported by Substantial Evidence**

The TCA "generally preserves the traditional authority of state and local governments to regulate the location, construction, and modification of wireless communications facilities like cell phone towers, but imposes specific limitations on that authority." *Mun. Communs., LLC v. Cobb Cty.*, 796 F. App'x 663, 668 (11th Cir. 2020) (quoting *T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 300 (2015)) (cleaned up). The TCA requires that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). "Although a locality must make its reasoning available in writing, there is no specific requirement regarding the format that writing must take, and a locality can rely on a detailed hearing transcript in order to support its decision. . . ." *Mun. Communs.*, 796 F. App'x at 668-69. "The substantial evidence standard under 47 U.S.C. § 332(c)(7)(B)(iii) is the same as the substantial evidence standard used by courts to review agency decisions. 'Substantial evidence' is defined as 'more than a mere scintilla but less than a preponderance[]'" or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 669 (quoting *Michael Linet, Inc. v. Vill.*

*Of Wellington, Fla.*, 408 F.3d 757, 762 (11th Cir. 2005)); *Am. Tower Ltd. P'ship v. City of Huntsville*, 295 F.3d 1203, 1207 (11th Cir. 2002). Verizon bears the burden of proving that the decision was not supported by substantial evidence. *Id.* "If the decision is not supported by substantial evidence, Section 332 authorizes federal courts to overrule the local board's decision." *Am. Tower Ltd.*, 295 F.3d at 1207.

Verizon argues that the City's denial of the Application "was not based on any legal requirement" but that the City Council "appeared to have been swayed by 'not in my backyard' arguments from local residents and unsubstantiated speculation that the proposed tower would harm residential property values" for which there was no supporting evidence. (Doc. 29 at 17.) Verizon contends that the City's denial letter states "in a conclusory fashion" that the Application did not conform with the Comprehensive Plan but that it "does not explain how or cite any aspect of the CUP Application or Comprehensive Plan that are inconsistent." *Id.* at 20.

In the City's written letter regarding the denial of the Application, the City stated its decision was based on the "substantial evidence" in the record, including, that: the telecommunications tower would be 159 feet high and exceed the natural tree canopy, the tower and Club Site would be located within a few hundred feet of residential structures, the proposed site is not the only suitable site for Verizon, there was no evidence that Verizon followed up with owners of non-residential property after sending a single letter in the mail on October 9, 2018, Verizon only offered those property owners $500 per month but did not offer them the same amount it offered to the Valdosta Country Club ($2,000 per month), there are other sites within the Valdosta Country Club that Verizon could use, Verizon failed to exhaust efforts to locate the tower in non-residential districts as required by the LDR, and people were concerned about the aesthetics of having the tower-tree be taller than the existing trees and the effects on property values. (Doc. 28-20 at 2.) The letter went on to list five reasons that Verizon's application was denied:

1. "The CUP is not in conformity with the policy and intent of the Comprehensive Plan, and the evidence shows Verizon failed to adequately consider alternate non-residential sites." (Doc. 28-20 at 2.) Specifically, the City wrote that the LDR prefers placement of telecommunications towers in non-residential areas and that

9

applicants proposing a tower in an R-15 residential zone "*shall* provide evidence as to why alternative sites" are not proposed. *Id.* Denials of requests to alternative site owners "shall be in writing." *Id.* at 3. The City explained that Verizon's inquiry into alternative sites "was insufficient" as Verizon merely sent a single letter sixteen months before the Council meeting proposing 25% of what Verizon was actually willing to pay, and that there was no evidence that any owner denied Verizon's request or that Verizon attempted to follow up with the property owners. *Id.*

2.  "The evidence shows the placement of the tower at the proposed site would negatively affect property values in the area thereby adversely affecting the existing use or usability of adjacent or nearby property." (Doc. 28-20 at 3.) The letter noted that while there were conflicting reports about the effect of cell phone towers on property values, the Council concluded that a 159-foot tower close to residences would negatively affect property values. *Id.*

3.  "The evidence shows the proposed rezoning will adversely affect the existing use or usability of adjacent or nearby property due [to] aesthetic issues." (Doc. 28-20 at 3.) The letter noted that while the tower would resemble a large pine tree, it would "greatly exceed the natural tree canopy." *Id.* (citing Conditional Use Review Tower criteria ¶ 1).[4] The Council concluded that the images presented by Verizon were not from the vantage point of the adjacent properties and that there was evidence that adjacent property owners and other residential areas would be able to see the tower, which "would clearly look like a metallic phone tower instead of a natural tree" which will be "aesthetically displeasing." *Id.* at 3-4.

4.  "Evidence was presented showing that the positioning of the tower would result in a use that will cause an excessive or burdensome use of existing streets." (Doc. 28-20 at 4.) The Council wrote that construction equipment and vehicles would have to access the tower along "a narrow municipal street with no sidewalks" that would "create safety concerns." *Id.*

5.  "Granting a Conditional Use Permit for a new telecommunications tower in an R-15 Zoning District would create a dangerous precedent for other

---

[4] The Court believes this citation refers to LDR § 218-24(C)(1).

telecommunications towers in residential areas." (Doc. 28-20 at 4.) The Council was concerned that placement of the proposed tower "is not consistent with zoning district in which it would be located" and that granting the CUP "would have a precedential concerning effect disfavored by the City and LDR." *Id.* (citing Conditional Use Review criteria ¶¶ 1, 2).

The LDR generally discourages placement of telecommunications facilities in residential areas as the Council explained. The LDR specifically states that its purpose and intent is to "[a]void locating telecommunication facilities in residential areas whenever possible" and to "[e]ncourage the location of towers in appropriate nonresidential areas." LDR § 218-20(C)(1)-(2). It further provides that applicants proposing a tower in an R-15 zone "shall provide evidence as to why alternate sites . . . have not been proposed." LDR § 218-22(L). Furthermore, Council's letter cited the LDR's "factors considered in granting conditional use permits," including: "[t]he proposed telecommunications facility height and the height of adjacent or nearby structures and/or tree coverage" and the "[p]roximity of the telecommunications facility to residential structures . . . and the degree of visual intrusiveness of the proposed tower of facility from said residential areas." LDR § 218-24(C).

But the Court's review of the City's decision is not so limited. The Court should look at the whole record, but only "in light of the locality's stated reasons for its decision." *Mun. Communs., LLC v. Cobb Cty.*, 796 F. App'x 663, 671 (11th Cir. 2020); *Preferred Sites, LLC v. Troup Cty.*, 296 F.3d 1210, 1218 (11th Cir. 2002) ("[T]o determine whether the substantial evidence standard is met, a court should view the record in its entirety, including evidence unfavorable to the state or local government's decision."). However, the court "cannot displace the [defendant's] fair estimate of conflicting evidence and cannot freely re-weigh the evidence." *Am. Tower*, 295 F.3d at 1209 n.8. Furthermore, the City's denial letter stated that there were other reasons for the denial and that the letter was not exhaustive. (Doc. 28-20 at 1, 4) (explaining that the evidence is "discussed partially below" and that the Application was denied "[f]or these reasons, among others"). As such, the Court has looked at all evidence in the administrative record, both favorable and unfavorable to the City's decision, in making its determination herein. The Court need not reach the question of whether there was substantial

evidence to support each of the City's stated reasons for its denial because the record shows that there was substantial evidence for at least the following two reasons for the City's denial.

### 1. Verizon's Compliance with the Comprehensive Plan and Efforts to Secure Property in Non-Residential Zones

A court can properly consider whether a telecommunications company "can reasonably place a cell site in an alternative location and eliminate the residents' concerns." *Michael Linet, Inc. v. Vill. of Wellington*, 408 F.3d 757, 762 (11th Cir. 2005).

As already explained, the LDR has a strong preference that telecommunications facilities not be built in residential areas "whenever possible. LDR § 218-20(C)(1). The LDR also requires that applicants "provide evidence demonstrating that they cannot provide adequate personal wireless communication service . . . without the use of a telecommunications facility at the specific location requested." LDR § 218-22(M). Applicants shall also provide evidence "that the proposed tower constitutes the least intrusive means necessary to close significant service gaps" and "[s]tatements shall be provided demonstrating that all alternatives have been investigated by the applicant . . . ." LDR § 218-22(N). Finally, the LDR contains a specific provision titled "Residential Districts not Favored" which states: "No tower permit shall be granted for any site zoned  . . . R-15 . . . unless the evidence establishes that it is not possible to locate said tower in a non-residential district and close significant service gaps . . . ." LDR § 218-24(B)(3). Furthermore, the Council hearing transcript and the Council's denial letter are replete with concerns about placing a telecommunications tower in a residential area and close to residences. (Docs. 28-7 and 28-20.)

Verizon submitted copious materials in its Application which totaled 1,997 pages. (Docs. 27-1 through 27-10). At the Council hearing on February 10, 2020, Verizon's interests were represented by its attorney Patton Hahn, consultant Bryan Devine, and engineer Glen Finn. (Doc. 28-7 at 3-4.) Hahn and Devine stated that other property owners were contacted by letter, that there were phone calls, and that no one responded. *Id.* at 5. When asked whether Verizon ever told those property owners that Verizon was willing to pay $2,000 a month instead of $500 a month, Devine responded: "We do not know that specifically, no. All we know is that we reached out to the town, and got no response." *Id.* Specifically, the transcript of the hearing reveals that three letters were sent in October 2018. *Id.* at 7, 9.

In its summary judgment brief, Verizon argues that it "sent two rounds of letters to owners of non-residential properties and did not receive a response" and that it "attempted (unsuccessfully) to follow up with these property owners by telephone." (Doc. 29 at 21.) But Verizon does not cite to any evidence in the record before the Council to support these arguments; Verizon cites only to a deposition that took place in the discovery phase of this case and which was not before the Council when it denied the Application.[5] It is well-established that "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of" the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court does not find that a March 2021 deposition is itself sufficient evidence where it is not clear whether the Council would have had such evidence at the time it denied the Application.[6] However, even that deponent testified that she sent two letters to the candidates and that she "did not call any of them, other than the country club" because she "couldn't locate numbers" and she does not "recall" whether she searched for their phone numbers online. (Doc. 28-5 at 9.) Not only is this testimony inconsistent with the statements made by Verizon's representatives at the Council hearing, but it shows only that Verizon sent two letters to three property owners who did not respond. While this may constitute *some* investigation and effort to find alternative sites, it does not show that Verizon investigated "all" alternative sites and that it was "not possible" to build its tower in a non-residential area as Verizon was required to show per the LDR. LDR §§ 218-22(N), 218-24(B)(3). Verizon cites two District of Massachusetts case to argue that the City must show there are viable alternative sites (Doc. 37 at 11), but Verizon has not shown that such a standard applies in the Middle District of Georgia where the City's ordinance clearly places the onus on Verizon to show that no alternative site is possible.

Moreover, in the deposition of Brian Devine, Devine testified that landowner Roger Budd contacted him prior to the Council hearing and expressed that he was interested in

---

[5] "[T]he district court is in any case relieved of the obligation to ferret through the record." *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008).

[6] Courts cannot "consider additional evidence in the record" which was not before the city at the time it denied the application. *Mun. Communs., LLC*, 796 F. App'x at 671; *see also Preferred Sites*, 296 F.3d at 1220 n.9 (explaining that a party "may not rely on rationalizations constructed after the fact").

allowing Verizon to place a tower on his land, but Devine did not follow up with him. (Doc. 28-3 at 12, 15.) According to Devine's email to the non-residential property owner on January 20, 2020, the property was near the country club. (Doc. 34.) Verizon now argues that Budd expressed interest only after the Application was submitted and shortly before the Council hearing. (Doc. 37 at 14.) However, Verizon does not dispute that this was not mentioned to the Council at the hearing or that Budd's property is not a viable alternative site that Verizon could pursue. Thus, this evidence, which was not presented to the Council, only further indicates that Verizon failed to comply with the LDR's requirement to provide evidence that no alternative sites were possible.

Furthermore, when asked why Verizon cannot place its tower closer to the country club rather than in the neighborhood, Hahn responded that Verizon needs a road for "vehicular access to it so that Verizon can get to the compounds and come out to make this work as necessary." (Doc. 28-7 at 6.) Council member Ben Norton then stated that "there's an existing driveway, parking lot right at the country club. Great Access. More accessible. . . ." to which Hahn's full response was: "If the country club doesn't let us put it there, we can't put it there." *Id.* Nothing further was said by Verizon on this issue, and for purposes of the Court's review at this stage, the City could properly conclude that Verizon did not provide sufficient evidence that it could not put the tower closer to the country club. "[T]he Court must look to the substantive requirements of local regulations in evaluating the denial of a permit for the construction of a wireless facility." *Grp. EMF, Inc. v. Coweta Cty.*, 131 F. Supp. 2d 1335, 1343 (N.D. Ga. 1999). The LDR clearly requires the applicant to provide evidence of its need to use the specific location proposed, that it investigated all alternatives, and that it was not possible to place the facility in a non-residential location. Verizon failed to do so.

For the foregoing reasons, substantial evidence supports the Council's decision to deny the Application on the basis that Verizon failed to provide sufficient evidence that it could not place the tower in a non-residential alternative location. But this is not the only reason supported by substantial evidence.

### 2. The Tower's Visual Obtrusiveness and Impact on Aesthetics

In passing the TCA, Congress acknowledged that "there are legitimate State and local concerns involved in regulating the siting of such facilities, such as aesthetic values and the

costs associated with the use and maintenance of public rights-of-way." *Preferred Sites, LLC v. Troup Cty.*, 296 F.3d 1210, 1214 (11th Cir. 2002) (citation omitted). Nonetheless, "[i]t is well-established in this Circuit that 'a blanket aesthetic objection does not constitute substantial evidence under § 332. Such a standard would eviscerate the substantial evidence requirement and unnecessarily retard mobile phone service development.'" *Mun. Communs.*, 796 F. App'x at 669 (quoting *Michael Linet, Inc. v. Vill. Of Wellington, Fla.*, 408 F.3d 757, 762 (11th Cir. 2005)). Thus, "[a]esthetic concerns may be a valid basis for denial of a permit *if* substantial evidence of the visual impact of the tower is before the board." *Preferred Sites, LLC v. Troup Cty.*, 296 F.3d 1210, 1219 (11th Cir. 2002).

The LDR requires that telecommunications facilities "match the existing structure so as to reduce visual obtrusiveness," blend "to the existing natural setting and built environment," and "be integrated through location and design to blend in with existing characteristics of the site." LDR § 218-23(G), (H), (K). Among the "factors to be considered in granting conditional use permits" are: "[s]urrounding topography, particularly with regard to the ability to screen or fail to screen proposed telecommunications facilities[,]" "[s]urrounding tree coverage and foliage, particularly with regard to the ability to screen or fail to screen proposed telecommunications facilities[,]" and "[d]esign of the telecommunications facility, with particular reference to . . . alternative tower structures that have the effect of reducing or eliminating visual obtrusiveness." LDR § 218-24(C)(4)-(6).

Verizon argues that "[t]here was no evidence demonstrating that Verizon's proposed facility would be visible from any of the residences in the area near the proposed tower or that Verizon's efforts to camouflage the proposed facility would fail" but that the only evidence was "mere speculation from local residents." (Doc. 37 at 18.) While Verizon concedes that its tower "must be located above the treeline," it nonetheless argues that its "willingness to mitigate the overall aesthetic impact of the tower using camouflage" was sufficient to recommend approval of the Application. *Id.* Verizon contends that "[t]he City had no evidence at the Council hearing to support denial of the CUP Application based on its aesthetic impact." *Id.* The Court disagrees.

Among others, Verizon submitted the following images in its Application:



(Doc. 28-16 at 2, 30.)[7]

 A resident from Bellemeade Drive spoke at the Council hearing stating that the photos are from 500 or 600 yards away and that from the residences closer to the tower, "it won't look like a tree . . . They'll see a tower that has green decorations on it." (Doc. 28-7 at 9.) Another resident who lives "at the end of Bellemeade Drive. . . . [] very close to where Verizon proposes to erect the 159-foot cell tower" stated at the Council hearing "a visit to the backyards of the two properties most affected" reveals how the proposed cell tower would impact aesthetics. *Id.* at 6-7. She stated that the pictures barely showed any houses in the

---

[7] There are minor, unavoidable formatting differences between the text on the images here versus the text on the actual images submitted to the Council that are irrelevant for purposes of this Order.

background which was "so misleading" because the two closest houses are actually "so visible from there that you can see the windows on [one] house" and the other house is also visible. *Id.* at 7.

Taken together, there was substantial evidence to deny the Application because of aesthetic concerns. The substantial evidence standard is lower than the preponderance of the evidence standard and requires "'more than a mere scintilla'" or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mun. Communs.*, 796 F. App'x at 669 (quoting *Michael Linet, Inc. v. Vill. Of Wellington, Fla.*, 408 F.3d 757, 762 (11th Cir. 2005)); *Am. Tower Ltd. P'ship v. City of Huntsville*, 295 F.3d 1203, 1207 (11th Cir. 2002). In *Am. Tower*, the Eleventh Circuit concluded in its brief, published opinion that "testimony from several residents on the negative aesthetic and value impact of the proposed tower" constituted substantial evidence to support the board's decision to deny the tower application. 295 F.3d at 1209 (reversing and remanding the district court's order granting summary judgment to the plaintiffs). Likewise, the Eleventh Circuit again concluded in a published opinion that substantial evidence to support a city's denial of a tower application existed where residents testified about their concerns about placing a tower in their golf community and defendant "also failed to show that an alternative location was unavailable or unfeasible." *Michael Linet, Inc.*, 408 F.3d at 762.[8] As other courts in this district have concluded, aesthetic concerns can be a valid basis for denial if "supported by objective facts or evidence." *Wireless Towers, LLC v. City of Jacksonville*, 712 F. Supp. 2d 1294, 1302 (M.D. Fla. 2010) ("However[] subjective though the standard may be, it is similar to other subjective determinations that local zoning and land use bodies routinely make. . . . In this circumstance, the Federal Telecommunications Act was not violated . . . ." where the denial was supported by objective evidence.). This is not a case where there were only "generalized objections with no articulated reasons for the opposition" such that there was only "scant evidence of opposition to the construction of" the proposed tower. *Preferred Sites, LLC*, 296 F.3d at 1219 (finding a lack of substantial evidence). And the question at this stage is not whether any efforts were made to

---

[8] In both of those cases, it appears that the relevance of a realtor testifying was to support the claim that the tower would decrease property values, but the Court finds no reason that a realtor would need to testify as to the impact on a community's aesthetic values.

disguise the tower or whether the City could grant the Application. Here, the evidence established that the tower would rise well above the existing tree canopy, that the tower would be visible from far distances (and certainly from the nearby residences), and that Verizon was aware of non-residential alternative sites that it failed to adequately pursue.

As such, the Court is satisfied that substantial evidence existed to support the City's denial of Verizon's application, and the City is due to be granted summary judgment on Count One. The Court finds this resolution appropriate especially in light of the standard of review applicable to Count One. Both Parties' have stated in their supplemental briefing that the Court must decide their motions solely on the administrative record. (Doc. 51 at 2; Doc. 53 at 2.) Further, the court "cannot displace the [defendant's] fair estimate of conflicting evidence and cannot freely re-weigh the evidence." *Am. Tower*, 295 F.3d at 1209 n.8. Thus, the City's summary judgment motion (Doc. 31) is **GRANTED** as to Count One. Verizon's summary judgment motion (Doc. 28) is **DENIED** as to Count One.

### B. Whether the Denial of the Application Effectively Prohibits the Provision of Wireless Services

The TCA provides that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—. . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C.S. § 332(c)(7)(B)(i).

Based on this provision, Verizon argues that it can prevail on summary judgment if it shows that "(1) a significant gap exists in the applicant's wireless coverage and (2) the proposed facility is the least intrusive means to close that gap." (Doc. 29 at 30; 37 at 27.) The Eleventh Circuit has not addressed how courts should assess and apply this standard, and there appears to be a circuit split on how to do so.

### 1. Whether a Significant Gap Exists in Verizon's Wireless Coverage

It appears that both Verizon and the City agree that as to the first prong, the Court should first determine whether a significant gap exists in the provider's own coverage. (Doc. 37 at 27; 31-1 at 27-28.)[9] The City argues that Verizon has failed to show a significant gap in

---

[9] For the reasons stated by our sister courts, the Court agrees that this interpretation applies. *See, e.g., South v. City of Roswell*, No. 1:10-CV-1464-AT, 2016 U.S. Dist. LEXIS 203702, at *42-43 (N.D. Ga. Oct. 7, 2016) ("In

its coverage, especially because residents stated at the hearing that they had no issues with coverage. (Doc. 31-1 at 29.) But the Court agrees with Verizon that "'[u]nlike the substantial evidence issue, the issue of whether a locality has prohibited or effectively prohibited the provision of wireless services is determined de novo by the district court' without deference to the locality's decision." (*PI Telecom Infrastructure, LLC v. City of Jacksonville*, 104 F. Supp. 3d 1321, 1346 (M.D. Fla. 2015) (citations omitted); *see also South v. City of Roswell*, No. 1:10-CV-1464-AT, 2016 U.S. Dist. LEXIS 203702, at *44 (N.D. Ga. Oct. 7, 2016) (same). Courts have also concluded that the wireless provider has a "heavy burden" at this stage. *South v. City of Roswell*, No. 1:10-CV-1464-AT, 2016 U.S. Dist. LEXIS 203702, at *44 (N.D. Ga. Oct. 7, 2016) (citation omitted).

Here, Verizon argues that it has relied on a wide range of data and that it has submitted evidence and a declaration from its engineer "Glenn Finney" to show that is has "a significant gap in coverage and capacity in this area." (Doc. 29.) Finney's declaration is consistent with Verizon's argument, asserting that Verizon is "spectrum exhausted" and cannot meet its needs with its existing facilities and that end users will experience "dropped and diminished quality voice calls and significant problems in term of downloading and uploading data." (Doc. 28-1 ¶¶ 10, 18.) In response, the City did not address this evidence and made no further argument about whether a significant gap in coverage exists.[10] Thus, for purposes of resolving the pending motions, the Court finds that Verizon has made an adequate showing that it has a significant gap in coverage in the affected area. In any case, Verizon has demonstrated that a genuine issue of material fact remains as to the existence of a significant gap.

### 2. Whether the Proposed Facility is the Least Intrusive Means to Close the Gap

Verizon argues that this prong requires "that the wireless provider show a 'good faith effort has been made to identify and evaluate less intrusive alternatives, *e.g.*, that the provider has considered less sensitive sites, alternative system designs, alternative tower designs,

---

the absence of any Eleventh Circuit authority on this issue, the Court defers to the FCC and concludes that the 'multiple-provider rule' should apply.").

[10] As a result, the City has effectively abandoned its position on this issue. *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argued in initial response to motion for summary judgment; *Hudson v. Norfolk Southern Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.") (citation omitted).

placement of antennae on existing structures, etc.'" (Doc. 37 at 27) (quoting *APT Pittsburgh Ltd. Pshp. v. Penn Twp. Butler Cty.*, 196 F.3d 469, 480 (3d Cir. 1999).[11] Other circuits have stated that the provider's proposal must be the "only feasible plan." *Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d 38, 50 (1st Cir. 2009). Ultimately, the Court thinks these standards are distinct without a difference, as both essentially ask the same question: were there less intrusive alternatives that the plaintiff should have further considered? To answer this question, courts must make a case-by-case determination balancing "the carrier's desire to efficiently provide quality service to customers and local governments' primary authority to regulate land use." *Omnipoint Holdings*, 586 F.3d at 51.

The evidence shows that the proposed site is at the end of a narrow, residential street in a neighborhood with fifty residences, and the City's ordinance specifically mandates that telecommunications towers not be built in this residential zone unless "it is not possible to locate said tower in a non-residential district and close significant service gaps . . . ." LDR § 218-24(B)(3); (Doc. 38 ¶¶ 2-6). Verizon made some effort to contact three non-residential property owners by mail, but Verizon's agent never conducted an internet search to find the phone numbers or email addresses of these owners, never called these owners, and offered these property owners 25% of the payment it offered to the Country Club, which Verizon did view on the internet and did call and email. (Doc. 28-5 at 9-11; Doc. 28-3 at 13-14.) Indeed, the agent testified at her deposition that she is not familiar with neighborhoods in Valdosta and that she "just started from the country club." (Doc. 28-5 at 4.) On her site visit to the Country Club, she stopped for "an hour, hour-and-a-half" and did not drive around Valdosta before or after the visit. *Id.* Furthermore, the evidence shows that after Verizon negotiated to pay the Country Club $2,000 per month and submitted its Application, at least one non-residential property owner was interested in having the tower on his property, but Verizon did not pursue that owner further. (Doc. 28-3 at 15.) Verizon's explanation as to why this owner's site was not further evaluated is that the owner expressed interest after Verizon submitted its application.

---

[11] The Court notes that the *APT Pittsburgh* decision is from 1999 and applied a different standard that affected its ultimate conclusion that the company had failed to show that the proposal was the least intrusive means of closing a gap in coverage because the company did not show how other providers were servicing the area. Id. at 481. Thus, this opinion is of questionable reliability and persuasiveness.

On Count Three, the Court must make a *de novo* determination based on all of the evidence in the record. Although the Court found in favor of the City on Count One where a more deferential standard of review applies, the Court cannot conclude as a matter of law that Verizon failed to act in good faith in identifying and evaluating less intrusive alternatives or that Verizon's proposal to erect a tower at the Club Site is not the least intrusive means to close its coverage gap. In other words, genuine issues of material fact remain on this issue.

As such, the Court finds that summary judgment is not appropriate for Count Three.

## CONCLUSION

Accordingly, Verizon's Motion for Summary Judgment (Doc. 28) is **DENIED**, and the City's Motion for Summary Judgment (Doc. 31) is **GRANTED-IN-PART** as to Count One and **DENIED-IN-PART** as to Count Three.

As both Parties agree that the Court can set a bench trial to resolve factual disputes concerning Count Three, the Court will notice this case for a bench trial separately.

**SO ORDERED**, this 6th day of December 2021.

**/s/ W. Louis Sands**
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**